

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-17-1996

# M.C. v. Cent Regional Sch

Precedential or Non-Precedential:

Docket 95-5606,95-5623

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"M.C. v. Cent Regional Sch" (1996). *1996 Decisions*. Paper 198.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/198

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO.  95-5606
_____

M. C.; AND G. C.,
ON BEHALF OF THEIR SON, J.C.

v.

CENTRAL REGIONAL SCHOOL DISTRICT

Appellant
_____

NO.  95-5623

M. C.; AND G. C.,
ON BEHALF OF THEIR SON, J.C.

Appellants
v.

CENTRAL REGIONAL SCHOOL DISTRICT

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 93-cv-04752)

_____

Argued:  November 14, 1995

Before: BECKER, SCIRICA, Circuit Judges, and
COHILL, District Judge[1]

(Filed  April 17, 1996)

REBECCA K. SPAR, ESQUIRE
(ARGUED)
Cole, Schotz, Meisel, Forman

_____

[1]The Honorable Maurice B. Cohill, Jr., United States District
Judge for the Western District of Pennsylvania, sitting by
designation.

1

& Leonard, P.A.
25 Main Street, 3rd Floor
P.O. Box 800
Court Plaza North
Hackensack, NJ   07601
Attorney for M. C; G. C., on
behalf of their son, J. C.
Appellees in No. 95-5606
Appellants in No. 95-5623


RICHARD J. KAPLOW, ESQUIRE
(ARGUED)
53 Elm Street
Westfield, NJ   07090

FRANK N. YURASKO, ESQUIRE
63 Route 206 South
P.O. Box 1041
Somerville, NJ   08876


Attorney for Central Regional
School District
Appellant in No. 95-5606
Appellee in No. 95-5623

_____

OPINION OF THE COURT
_____


BECKER, Circuit Judge.

This case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(e)(2). Pursuant to IDEA, a school district is required to provide a disabled child with a "free appropriate education." 20 U.S.C. §1400(c). J.C., a severely mentally retarded sixteen-year-old male, has attended the Ocean County Day Training Center ("OCDTC") since 1987. In 1992, concerned about the appropriateness of their son's instruction, J.C.'s father and stepmother, M.C. and

2

G.C. ("plaintiffs"), began proceedings to secure both a residential placement for J.C. and compensatory education beyond his twenty-first year to make up for what they believed to be long-standing deficiencies in his program. In 1995, the district court ordered that J.C. be relocated to a residential school, but refused to award compensatory education because it found that the defendant, Central Regional School District ("Central Regional," "school district," or "district"), had, in good faith, provided J.C. with some educational program. Central Regional now appeals the residential placement, and plaintiffs cross-appeal the determination regarding compensatory education.

Rejecting Central Regional's challenge, we hold that the district court used the proper legal standard when it granted residential placement, and that its factual findings regarding that claim are supported in the record. We will therefore affirm the award. The cross-appeal requires us to revisit an issue reserved in our recent decision, Carlisle Area School v. Scott P., 62 F.3d 520, 537 (3d Cir. 1995), and to decide the proper standard for an award of compensatory education. A school district that knows or should know that a child has an inappropriate Individualized Education Program (IEP) or is not receiving more than a de minimis educational benefit must, of course, correct the situation. We hold that, if it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, excluding only the time reasonably required for the school district to rectify the problem. Because the district court applied an incorrect "good

3

faith" standard, we will reverse on the cross-appeal and remand for further proceedings consistent with this opinion.

## I. Factual Background/ Procedural History

### A.   Factual Background

J.C.'s IEP stresses personal and self-help goals such as toileting and eating as well as more general communication, domestic, recreation, vocation, and community training skills. His preschool records reflect that he progressed well during his initial years of education.  Following J.C.'s placement at OCDTC in 1987, his development slowed.  Since 1989, J.C. has made little consistent improvement and in some aspects has even regressed.

For example, in 1988 and 1989, J.C.'s teachers, Juanita Jones and Susan Trainor, reported that J.C. could remove his shirt independently.  In 1990, Trainor indicated that J.C. could remove his shirt only after it was started for him.  By 1992, J.C.'s school records did not reflect any independent disrobing efforts.  Trainor related only that J.C. was "cooperative" and would "extend [his] arm/leg for dressing."

Likewise, pulling his pants up and down in preparation for toileting has been a self-help goal in J.C.'s IEP since 1989. By February 1991, J.C. was reportedly pulling his pants down with "moderate" physical assistance on two out of five days.  In May 1991, J.C. continued to lower his pants with "moderate" assistance.  In May 1992, J.C. had regressed to where he was able to pull his pants down on two out of five days only with "maximum" physical assistance.  Similar reversion occurred in

4

J.C.'s ability to spear food, to drink from a cup, to communicate, and to pay attention.

Not only did J.C. perform poorly on stated IEP goals, but his IEP also failed to include several important objectives. For example, Central Regional's records indicate that J.C.'s self-stimulatory behavior, like chewing his shirt, was a serious problem impairing his educational progress. Despite this fact, J.C.'s IEP contained no strategies to reduce the incidence of this behavior.

Another gap in J.C.'s IEP was parent training. According to Trainor, in order for J.C. to make steady progress, his program needed to be consistently implemented both inside and outside of the classroom throughout all his waking hours. Nevertheless, the IEP did not include parent training. Minutes of the March 15, 1990, IEP meeting indicate that the plaintiffs requested someone from the school to come to their home to help with toileting and independent feeding. They were never told that parent training was a related service that could be provided under J.C.'s IEP.

B.   Procedural History

1.   The Administrative Hearing

Concerned that J.C. was not receiving a free appropriate education as guaranteed under IDEA, M.C. and G.C. wrote to Central Regional to request that J.C.'s 1992-93 IEP be revised and that he be placed in a residential school. When Central Regional refused to change the IEP, M.C. filed a Petition for Hearing with the New Jersey Department of Education.

5

Following a hearing, an Administrative Law Judge (ALJ) found that OCDTC had provided an "appropriate education" for J.C. To give form to the "appropriate education" standard, the ALJ applied the Supreme Court's holding in Board of Education v. Rowley, 458 U.S. 176, 200 (1982), that a school district must provide instruction "sufficient to confer some educational benefit upon the handicapped child." According to the ALJ, a child with J.C.'s disabilities was not capable of more than very "limited and varied progress." As such, the ALJ concluded that J.C.'s slight improvement "at times" in his ability to prepare himself to toilet, eat with a spoon, and drink from a cup satisfied Rowley's requirement that his schooling provide him "some educational benefit." In his view, any residential placement went far beyond J.C.'s educational needs.

2. The District Court Hearing

M.C. and G.C. appealed the ALJ's decision to federal district court. The court agreed with the ALJ's conclusions that J.C.'s achievements appeared to be de minimis as well as inconsistent and scattered, and that in some areas J.C. had even regressed. However, the court could not determine, based on the evidence presented at the administrative hearing, whether J.C.'s inadequate progress was a reflection of his (lack of) potential or of the inappropriateness of his placement at OCDTC. Accordingly, it convened a hearing to receive supplemental evidence.

In the wake of this hearing, the district court reversed the decision of the ALJ and ordered residential

6

placement.  The district court concluded that the ALJ had applied the wrong legal standard in reaching his determination.  The ALJ had relied on the Rowley formulation that a disabled child need only receive "some educational benefit" from his instruction.  However, according to the district court, the ALJ failed to consider our cases interpreting that decision.  See Polk v. Cent. Susquehana Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988), cert. denied, 488 U.S. 1030 (1989);  Bd. of Educ. v. Diamond, 808 F.2d 987 (3d Cir. 1986).  Both Polk and Diamond make clear that an appropriate IEP must result in more than de minimis benefits to satisfy Rowley's "some educational benefit" standard.  As we wrote in Diamond, a plan for a severely handicapped student will satisfy the IDEA only if it is "likely to produce progress, not regression or trivial educational advancement."  Id. at 991.  According to the district court, the "limited and varied" progress that the ALJ found was de minimis and therefore not sufficient to satisfy IDEA.

In determining that residential placement was appropriate for J.C., the court credited the testimony of the plaintiff's expert, Dr. Dana Henning.[2]  According to Dr. Henning, J.C.'s IEP did not sufficiently address his needs.  She testified that J.C. was capable of more than the de minimis results he had realized at OCDTC, but that he needed the intensive, round-the-

---

[2]Dr. Henning has eighteen years of experience in teaching, assessing, evaluating and making educational recommendations for persons with severe or profound handicaps and challenging behaviors.  She estimated that she had evaluated close to a thousand severely and profoundly retarded children, one-third of whom had self-stimulatory behavior problems.

clock instruction of a residential school to receive meaningful benefit from his education. Central Regional now appeals the residential placement order. We review the district court's legal standard de novo and its factual findings for clear error. The district court denied the plaintiffs' request for compensatory education, and plaintiffs now appeal that determination. At issue is the legal standard used by the court, over which we exercise de novo review.

## II.  The Residential Placement

Central Regional launches a three-pronged attack upon the district court's order of residential placement. First, it argues that the district court misapplied Rowley, the principal authority establishing the standard of education services required under IDEA. We conclude that the district court did not misconstrue the Rowley rule. As this Court explained at length in Polk and Diamond, Rowley does not mean that IDEA is satisfied by affording the student a de minimis benefit. The record supports the district court's conclusion that if J.C. received any value from the education afforded by the defendant, it was trivial and that is not sufficient.[3]

Second, Central Regional contends that the district court erred in finding that J.C. had "untapped potential," and in basing its order for residential placement upon that determination. We hold that the court's conclusion that J.C had

_____

[3]We therefore do not need to address J.C.'s argument that, even if the Rowley standard were satisfied, New Jersey obligates Central Regional to meet a higher standard. See Geis v. Bd. of Educ., 774 F.2d 575, 583 (3d Cir. 1985).

8

untapped potential was not clearly erroneous.  As we have explained in <u>Kruelle v. New Castle County School District</u>, 642 F.2d 687, 693 (3d Cir. 1981), special education for a low-functioning child stresses (at least initially) basic life skills such as dressing, eating, and communicating.  The record reflects that J.C. had much potential in these areas.  For instance, Dr. Henning testified that J.C., on his own, would attempt to communicate his wants and needs to others by leading them where he wanted to go, an action which she concluded showed motivation and promise.

The court's decision to use its finding of untapped potential as a basis for residential placement was also not in error.  Dr. Henning, upon whom the court appropriately relied, attributed J.C.'s minimal progress at OCDTC to an inadequate program which, among other deficiencies, failed to address his self-stimulatory behaviors, and to an inappropriate placement, which did not allow him to practice his skills beyond the school day.  She testified that J.C. would develop more fully in a residential school.  The court was entitled to rely on her well-supported conclusions.

Third, Central Regional asserts that the district court incorrectly concluded that the least restrictive educationally appropriate setting for J.C. was a full-time residential facility.  In essence, the school district argues that the order for residential placement conflicts with the statutory preference for inclusion.  <u>Cf.</u> <u>Oberti v. Bd. of Educ.</u>, 995 F.2d 1204, 1220 (3d Cir. 1993).  On the record in this case, we are satisfied

9

that a residential program is required for J.C. to make meaningful educational progress and that it meets the requirements of IDEA.

As we have detailed above, in view of the deficiencies in J.C.'s past program, he could no longer make adequate progress in a day setting. The evidence supports the district court's conclusion that any attempts to reduce J.C.'s severe self-stimulatory behavior or improve his toileting, eating, and communication skills would succeed only in the intense atmosphere of a round-the-clock residential setting where a consistent educational program could be enforced throughout all of J.C.'s waking hours. A residential setting would also allow J.C. to learn skills in their natural atmosphere. According to Dr. Henning, effective instruction for J.C. (as well as many other severely disabled children) requires that skills be presented in their usual environment and at the natural time of day. For instance, J.C. could be better taught to cook in the residence's kitchen than in the artificial setting of a daytime classroom because he had trouble "generalizing" or transferring the skills learned in one environment to another. The trial record, thus supports the conclusion that a residential setting is the least restrictive placement for J.C. at this time. Our case law also supports this result. See, e.g., Diamond, 808 F.2d at 992 (3d Cir. 1986) (residential placement is "least restrictive" environment for severely disabled child); Kruelle, 642 F.2d at 693-95 (3d Cir. 1981) (residential placement is only "appropriate education" for seriously disabled child).

10

Decisions from other circuits also bolster our refusal to disturb the district court's determination that placement in a residential center is appropriate here, where a less structured environment cannot do the job. See Drew P. v. Clarke County Sch. Dist., 877 F.2d 927, 930 (11th Cir. 1989) (residential placement necessary for child with mental retardation and infantile autism to "make meaningful educational progress"), cert. denied, 494 U.S. 1046 (1990); Abrahamson v. Hershman, 701 F.2d 223 (1st Cir. 1983) (residential placement authorized if essential for student to make educational progress); see also 20 U.S.C. § 1401(16); 34 C.F.R. §§ 300.302, 300.551.

The district court's order, insofar as it requires residential placement, will therefore be affirmed. We will not direct modification of the order in response to plaintiffs' further contention that the district court erred in not directing Central Regional to place J.C. in a specific residential school. We find no abuse of discretion in that regard, though the district court is free to reconsider the matter of placement on remand. We note, in conclusion, that the residential placement may only be temporary. Once J.C. accumulates the life skills that he did not acquire while at OCDTC, he may well be able to return to a day placement. This will appear from the required yearly IEP evaluation.

## III. Compensatory Education

### A. Definition/ Historical Background

We now turn to the more difficult aspect of this case -- the cross-appeal of J.C. from the district court's order

denying compensatory education. Under IDEA, a disabled student is entitled to free, appropriate education until he or she reaches age twenty-one. 20 U.S.C. § 1412(2)(b). A court award of compensatory education requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation.[4]

Federal courts began awarding compensatory education after the Supreme Court determined in School Committee of Burlington v. Department of Education, 471 U.S. 359, 370-71 (1985), that tuition reimbursement was appropriate under the Education of the Handicapped Act, 20 U.S.C. §§ 1401-1461 (1982) (IDEA's predecessor). In a typical reimbursement scenario, a parent who believed that a child was not receiving an appropriate public education would place the child in private education at his or her own expense. Under Burlington, if a court later determined that the private placement was the appropriate one, the school district would have to reimburse the parent.

Tuition reimbursement was the Court's vehicle for satisfying both IDEA's pronouncement that children are entitled

---

[4]At least one federal court, see Johnson v. Bismarck Pub. Sch. Dist., 949 F.2d 1000, 1002 (8th Cir 1991), and numerous administrative law judges have upheld or awarded compensatory education during the summer months rather than after age twenty-one. See Perry A. Zirkel, Compensatory Education -- Questions and Answers, 10 The Special Educator 1, 147 (Dec. 10, 1994).

Parenthetically, the term compensatory education may also be used in a different sense to refer to special programs and services provided to "at-risk" students who are not succeeding in school but do not qualify for special education. Such programs include alternative schools, pregnancy and parenting programs, and group counseling programs. See, e.g., Catherine P. Clark, Compensatory Education in Texas (1993).

12

to a free appropriate education and the congressional intent to provide relief for the deprivation of this right. See Lester H. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990), cert. denied, 499 U.S. 923 (1991). Extending the Burlington decision, the Eighth Circuit in Miener v. Missouri, 800 F.2d 749, 754 (8th Cir. 1986), cert. denied, 459 U.S. 909 (1982), awarded compensatory education. The court reasoned that, like retroactive tuition reimbursement, compensatory education required school districts to "'belatedly pay expenses that [they] should have paid all along.'" Id. at 753 (quoting Burlington, 471 U.S. at 370-71). The court "was confident that Congress did not intend the child's entitlement to free education to turn upon her parent's ability to 'front' its costs." Id. In Lester H., we adopted the position of the Miener court and approved a compensatory remedy. 916 F.2d at 873.[5]

> B. Formulating a Standard

In the case at bar, the court devoted only one paragraph of its opinion to compensatory education and disposed of the issue in the following manner:

> With respect to plaintiffs'
> request for compensatory education,
> the Court concludes that such
> relief is inappropriate under the
> facts of this case. Plaintiffs
> rely on Lester H. by Octavia P. v.
> Gilhool, 916 F.2d 865 (3d Cir.
> 1990), cert. denied, 488 U.S. 923
> (1991), in which the school
> district knew before the child
> entered the school system that the

___

[5]In the process, we made clear that compensatory education could be awarded to plaintiffs who had already reached age twenty-one. Lester H. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990).

13

> district would be unable to provide an appropriate education. _Id_. at 873. The decision to permit compensatory education was premised on the district's failure to fulfil what it knew or should have known were its obligations. _Id_. The facts of the present case are easily distinguishable. Defendant provided J.C. with an education which it believed in good faith was appropriate. A difference of opinion as to the adequacy of an educational program is not equivalent to a complete and total failure to provide a child with an education. Therefore, this Court will not grant plaintiffs' motion with respect to this issue.

Thus, the district court applied a "good faith" standard in determining whether to award compensatory education. We review this approach de novo.

In order to define the correct standard for granting compensatory education, we must delineate the threshold of deficiency in the school board's stewardship necessary to trigger an award. Unfortunately, there is little caselaw or legal commentary to guide us. Likewise there are no New Jersey or federal regulations to direct our inquiry. While this is not the first time we have contemplated this issue, the facts of our previous cases have made our past analyses relatively straightforward.

In _Lester H._, 916 F.2d at 873, we upheld an award of two-and-one-half years of compensatory education due to the school district's outrageous behavior. In the fall of 1984, the district admitted that the twelve-year-old plaintiff was not

14

receiving an appropriate education.  Despite the existence of at least six suitable schools, the district did not locate an appropriate placement until January of 1987.  Id. at 873.  We wrote:

> [W]e hold that the district court did not abuse its discretion when it fashioned this remedy for Lester.  The court's award merely compensates Lester for what everyone agrees was an inappropriate placement from 1984 through January, 1987 and belatedly allows him to receive the remainder of his free and appropriate public education.

Id.

In Carlisle Area School v. Scott P., 62 F.3d 520 (3d Cir. 1995), we reviewed a district court's decision to grant six months compensatory education.  We reversed the award because the record contained no evidence indicating that the relevant IEP was inappropriate.  We concluded that, while we did not need to define the precise standard for awarding compensatory education, we could at least determine that it was necessary -- though not sufficient -- to show that some IEP was actually inappropriate. Id. at 537.  We noted that most cases awarding compensatory education had involved quite culpable conduct[6] but determined

---

[6] See, e.g., Burr v. Ambach, 863 F.2d 1071, 1073 (2d Cir. 1988) (awarding compensatory education where state institution disqualified a student because of its purported inability to accommodate his multiple handicaps without mentioning or considering placement in an extant special program for multiple handicapped students); Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857-58 (11th Cir. 1988) (awarding compensatory education to deter states from unnecessarily prolonging litigation); Miener v. Missouri, 800 F.2d 749, 754 (8th Cir. 1986) (reversing denial of compensatory education for a child who spent three years in mental health ward of a state hospital after

that a grant of compensatory education did not require bad faith on the part of the school district. Id. We left our analysis there, but must now flesh out the standard left sparse by Carlisle.

The Second Circuit has conditioned an award of compensatory education on the presence of a "gross" deprivation of the right to free and appropriate education. See Garro v. Connecticut, 23 F.3d 734, 737 (2d Cir. 1994) (requiring "gross procedural violation"); Mrs. C. v. Wheaton, 916 F.2d 69, 75 (2d Cir. 1990) (requiring "gross violation," defined as coercion of disabled child into terminating his right to further education). We reject this formulation because, in addition to being imprecise, it is not anchored in the structure or text of IDEA.

If the compensatory education standard is to spring from the Act, it must focus from the outset upon the IEP -- the road map for a disabled child's education. See 20 U.S.C. §1414(a)(5). When an IEP fails to confer some (i.e., more than de minimis) educational benefit to a student, that student has been deprived of the appropriate education guaranteed by IDEA. It seems clear, therefore, that the right to compensatory education should accrue from the point that the school district knows or should know of the IEP's failure.[7]

_____

district failed to provide any educational services notwithstanding its own evaluation recommending such services).
[7]This precept is consistent with our decision in Carlisle Area School v. Scott P., 62 F.3d 520, 537 (3d Cir. 1995), where we held that an award of compensatory education required a finding that an IEP was inappropriate.

The school district, however, may not be able to act immediately to correct an inappropriate IEP; it may require some time to respond to a complex problem.  Thus, our holding can be summarized as follows:  a school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a de minimis educational benefit must correct the situation.  If it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.  We believe that this formula harmonizes the interests of the child, who is entitled to a free appropriate education under IDEA, with those of the school district, to whom special education and compensatory education is quite costly.

Obviously the case against the school district will be stronger if the district actually knew of the educational deficiency or the parents had complained.  But a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith.  Rather, it is the responsibility of the child's teachers, therapists, and administrators – and of the multi-disciplinary team that annually evaluates the student's progress – to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

While we have little hard data on compensatory education, we do know that administrative law judges in this Circuit have awarded it. Our new standard meshes with the approach taken by these judges. See In Re Jeremy H., No. 593, slip op. at 27 (Special Education Appeals Review Panel Pa. May 21, 1993) (upholding compensatory education in order to rectify an inappropriate IEP). Our holding also accords with the conclusions of a recent article reviewing federal court strategies for awarding compensatory education. See Perry A. Zirkel, The Remedy of Compensatory Education under the IDEA, 95 Ed. Law Rep. 483 (1995). That article maintains that, in general, the prerequisite of a compensatory education award has not been the gross, egregious, or bad faith conduct of the school district but rather a simple finding that a child has received an inappropriate education.

Since the district court applied an incorrect standard, its order denying compensatory education must be reversed. The court found that J.C.'s IEP was inappropriate. It determined that the majority of the skills that J.C. possessed at the time of Dr. Henning's evaluation were gained before J.C. was placed at OCDTC in 1987, that the same rate of progress did not continue after he was placed at OCDTC, and that J.C. plateaued in 1989. Thus, J.C.'s educational deprivation appears to have lasted a long time. On remand, the district court should determine when the Central Regional knew or should have known that J.C.'s IEP was inappropriate or that he was not receiving more than de minimis educational benefit; it should also define the reasonable

18

time within which the district should have done something about it. Compensatory education should accrue from that point forward.

The order of the district court will therefore be affirmed in part and reversed in part and the case remanded for further proceedings consistent with this opinion.

_____