**TIMOTHY W., etc., Plaintiff, Appellant,**

v.

**ROCHESTER, NEW HAMPSHIRE, SCHOOL DISTRICT, Defendant, Appellee.**

No. 88–1847.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1989.

Decided May 24, 1989.

As Amended May 31, 1989.

Ronald K. Lospennato, Disabilities Rights Center, Inc., Concord, N.H., for plaintiff, appellant.

William R. Yeomans, Dept. of Justice, with whom Wm. Bradford Reynolds, Asst. Atty. Gen., Roger Clegg, Deputy Asst. Atty. Gen., and Jessica Dunsay Silver, Dept. of Justice, Washington, D.C., were on brief, for the U.S., amicus curiae.

John D. MacIntosh and Epstein, Burke, MacIntosh & Devito, P.A., Concord, N.H., on brief, for The Ass'n for Retarded Citizens of the U.S. and The Ass'n for Retarded Citizens of New Hampshire, amici curiae.

Frank J. Laski and Judith A. Gran, Philadelphia, Pa., Public Interest Law Center of Philadelphia, on brief, for TASH: The Ass'n for Persons with Severe Handicaps, TASH: New England, and The Nat. Ass'n of Protection and Advocacy Systems, amici curiae.

Kathleen B. Boundy, Center for Law and Educ., Inc., Cambridge, Mass., on brief for Senators Harkin, Weicker, Simon, and Stafford, amici curiae.

Gerald M. Zelin with whom Soule, Leslie, Zelin, Sayward & Loughman, Salem, N.H., was on brief, for defendant, appellee.

Gwendolyn H. Gregory, Deputy Gen. Counsel, Alexandria, Va., August W. Steinhilber, Gen. Counsel, Fairfax, Va., and Thomas A. Shannon, Executive Director, Alexandria, Va., on brief for the Nat. School Boards Ass'n, amicus curiae.

Bradley F. Kidder, Edward E. Lawson and Bradley F. Kidder Law Firm, Laconia, N.H., on brief, for the New Hampshire School Boards Ass'n, amicus curiae.

Before BOWNES, ALDRICH, and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff-appellant Timothy W. appeals an order of the district court which held that under the Education for All Handicapped Children Act, a handicapped child is not eligible for special education if he cannot benefit from that education, and that Timothy W., a severely retarded and multiply handicapped child was not eligible under that standard. We reverse.

## I. BACKGROUND

Timothy W. was born two months prematurely on December 8, 1975 with severe respiratory problems, and shortly thereafter experienced an intracranial hemor-

rhage, subdural effusions, seizures, hydrocephalus, and meningitis. As a result, Timothy is multiply handicapped and profoundly mentally retarded. He suffers from complex developmental disabilities, spastic quadriplegia, cerebral palsy, seizure disorder and cortical blindness. His mother attempted to obtain appropriate services for him, and while he did receive some services from the Rochester Child Development Center, he did not receive any educational program from the Rochester School District when he became of school age.

On February 19, 1980, the Rochester School District convened a meeting to decide if Timothy was considered educationally handicapped under the state and federal statutes, thereby entitling him to special education and related services. The school district heard testimony from Dr. Robert Mackey, Timothy's pediatrician and Medical Consultant for SSI (Supplemental Security Income Program), to the effect that Timothy was severely handicapped. Dr. Mackey recommended the establishment of an educational program for Timothy, which emphasized physical therapy and stimulation. Reports by Susan Curtis, M.S., and Mary Bamford, O.T.R., an occupational therapist, also recommended an educational program consisting of occupational therapy and increasing Timothy's responses to his environment. Testimony of Timothy's mother indicated that he responded to sounds. Carrie Foss, director of the Rochester Child Development Center, testified that Timothy localized sound, responded to his name, and responded to his mother. On the other hand, Dr. Alan Rozycki, a pediatrician at the Hitchcock Medical Center, reported that Timothy had no educational potential, and Dr. Patricia Andrews, a developmental pediatrician, stated that hydrocephalus had destroyed part of Timothy's brain. The school district adjourned without making a finding. In a meeting on March 7, 1980, the school district decided that Timothy was not educationally handicapped—that since his handicap was so severe he was not "capable of benefitting" from an education, and therefore was not

entitled to one. During 1981 and 1982, the school district did not provide Timothy with any educational program.

In May, 1982, the New Hampshire Department of Education reviewed the Rochester School District's special education programs and made a finding of non-compliance, stating that the school district was not allowed to use "capable of benefitting" as a criterion for eligibility. No action was taken in response to this finding until one year later, on June 20, 1983, when the school district met to discuss Timothy's case. Ruth Keans, from the Rochester Child Development Center, reported that Timothy responded to bells and his mother's voice, and recommended frequent handling and positioning. Brenda Clough, Program Director at the Rochester Child Development Center, also concluded that Timothy could respond to positioning and handling, and recommended a physical therapy program that included a tactile component. The school district, however, continued its refusal to provide Timothy with any educational program or services.

In response to a letter from Timothy's attorney, on January 17, 1984, the school district's placement team met. In addition to the previously listed reports, it had available a report from Lynn Miller, an expert in physical therapy for handicapped children, who had seen Timothy seven times, and concluded that he responded to motion and handling and enjoyed loud music. She determined that his educational needs included postural drainage, motion exercises, sensory stimulation, positioning, and stimulation of head control. The placement team recommended that Timothy be placed at the Child Development Center so that he could be provided with a special education program. The Rochester School Board,[1] however, refused to authorize the placement team's recommendation to provide educational services for Timothy, contending that it still needed more information. The school district's request to have Timothy be given a neurological evaluation, including a CAT Scan, was refused by his mother.

1. The School Board has the final decision-making authority for the school district.

On April 24, 1984, Timothy filed a complaint with the New Hampshire Department of Education requesting that he be placed in an educational program immediately. On October 9, 1984, the Department of Education issued an order requiring the school district to place him, within five days, in an educational program, until the appeals process on the issue of whether Timothy was educationally handicapped was completed. The school district, however, refused to make any such educational placement. On October 31, 1984, the school district filed an appeal of the order. There was also a meeting on November 8, 1984, in which the Rochester School Board reviewed Timothy's case and concluded he was not eligible for special education.

On November 17, 1984, Timothy filed a complaint in the United States District Court, pursuant to 42 U.S.C. § 1983, alleging that his rights under the Education for All Handicapped Children Act (20 U.S.C. § 1400 et seq.), the corresponding New Hampshire state law (RSA 186–C), § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the equal protection and due process clauses of the United States and New Hampshire Constitutions, had been violated by the Rochester School District. The complaint sought preliminary and permanent injunctions directing the school district to provide him with special education, and $175,000 in damages.

A hearing was held in the district court on December 21, 1984. Timothy's mother testified that he hears somewhat, sees bright light, smiles when happy, cries when sad, listens to television and music, and responds to touching and talking. Lynn Miller, who had been providing physical therapy to Timothy for over a year, testified that Timothy responded to movement, touch, music, and other sounds, and that his educational needs included postural drainage, range of motion, sensory stimulation of all kinds, correct positioning, proper sitting equipment, and work with his head control. Mariane Riggio, an expert in services for severely handicapped deaf-blind children, testified that Timothy was severely retarded but that he had definite light perception and could differentiate between sounds. She concluded that Timothy would be harmed if he was not given the benefit of an educational program. Dr. William Schofield, an expert in special education for the severely handicapped, testified that he had evaluated Timothy and that his educational needs included occupational therapy, development of some kind of communication program, a toileting program, a feeding program, and tactile stimulation discrimination which might be the basis for a communication process. Dr. Patricia Andrews, a developmental pediatrician, was the only person who testified that Timothy did not have educational needs and could not benefit from education. Her only contact with Timothy had been during an evaluation when he was two months old. While she testified that Timothy was profoundly mentally retarded and that an X-ray study of his brain showed he had virtually no cortex present, she also stated that such a study alone could not predict how much functioning was going to develop. On January 3, 1985, the district court denied Timothy's motion for a preliminary injunction, and on January 8, stated it would abstain on the damage claim pending exhaustion of the state administrative procedures.

On December 7, 1984, the State Commissioner of Education had ordered a diagnostic prescriptive program for Timothy: that he receive three hours of tutoring per week and that an evaluation be made concerning his capacity to benefit. Timothy's attorney, not the school district, made the necessary arrangements, and Timothy entered the school district's ABLE [2] program in May, 1985. The ABLE reports on Timothy indicate that he is handicapped, has educational needs, and would benefit from an educational program. An Evaluation Summary prepared on August 2, 1985 by Susan Keefe, a teacher who worked with Timothy in the ABLE program, concluded that he demonstrated abilities in visual development (could see shadows), auditory development (recognizes familiar voices, re-

---

**2.** The record does not state whether ABLE is an acronym or the full name.

sponds with smiles, extension of limbs, and turns head), tactile development (responds to stimulation), cognition communication, language (uses different facial expressions to show emotions), and social development (resists changes in his immediate environment). Keefe noted that Timothy had made particular progress in learning to move his head towards a person speaking his name and in learning to activate a switch. Subsequently, Timothy was allowed to attend the ABLE program intermittently: from October 29, 1985 to November 18, 1985, from December 2 to December 22, 1985, and from May 8, 1986 through June 3, 1986. Keefe reiterated her previous recommendation of a long-term uninterrupted program.

In September, 1986, Timothy again requested a special education program. In October, 1986, the school district continued to refuse to provide him with such a program, claiming it still needed more information. Various evaluations were done at the behest of the school district. On December 30, 1985, Dr. Cecilia Pinto–Lord, a neurologist, had given Timothy a negative prognosis for learning, but did indicate he had some awareness of his environment; on October 10, 1986, Dr. Pinto–Lord stated that acquisition of new skills by Timothy was very unlikely. On May 19, 1986, Mary–Margaret Windsor, an occupational therapist, conducted an occupational therapy evaluation and concluded that Timothy might respond to an oral-motor program, and that without consistent management strategies there was great potential for increased deformities and contractures (a condition of fixed high resistance to passive stretch of a muscle). A psychological evaluation conducted by Dr. John Morse, a psychologist, on June 23, 1986, concluded that Timothy demonstrates behavioral awareness of strangers, recognizes familiar voices, positively responds to handling by a familiar person, recognizes familiar sounds, and demonstrates a selective response to sound. He recommended physical and occupational therapy, and cognitive programming efforts to continue in the areas of consistently responding to sound, anticipating feeding, and operating an elec-

tronic device to operate a sound source. And on January 9, 1987, Ruth Keans, a physical therapist at the Child Development Center, performed a physical therapy evaluation and concluded that she did not see any voluntary movements, but that Timothy did respond to his mother's voice. She recommended physical therapy.

The school district, on January 12, 1987, arranged another diagnostic placement at the Rochester Child Development Center. A report of March 13, 1987 by Dr. Schofield, an expert in special education for the severely handicapped, indicated that Timothy was aware of his environment, could locate to different sounds made by a busy box, and that he attempted to reach for the box himself. He recommended the establishment of specific teaching/learning strategies for Timothy. On June 23, 1987, Rose Bradder, Program Coordinator at the Center, also recommended that Timothy continue to receive educational services. Experts in the field of special education retained on behalf of Timothy all concluded that he responded to certain stimuli and was capable of learning. For example, Dr. Robert Kugel, a physician specializing in developmental disabilities, found that Timothy responded to light, familiar voices, touch, taste, smell, pain, and temperature, that he made purposeful movements with his head, and that he showed evidence of retaining some higher cortical functioning which indicated that he could learn in certain areas.

On May 20, 1987, the district court found that Timothy had not exhausted his state administrative remedies before the New Hampshire Department of Education, and precluded pretrial discovery until this had been done. On September 15, 1987, the hearing officer in the administrative hearings ruled that Timothy's capacity to benefit was not a legally permissible standard for determining his eligibility to receive a public education, and that the Rochester School District must provide him with an education. The Rochester School District, on November 12, 1987, appealed this decision to the United States District Court by filing a counterclaim, and on March 29,

1988, moved for summary judgment. Timothy filed a cross motion for summary judgment.

Hearings were held on June 16 and 27, 1988, pursuant to Fed.R.Civ.P. 65(a)(2), relating "solely to the issue of whether or not Timothy W. qualifie[d] as an educationally handicapped individual." In addition to the large record containing the reports described above, additional testimony was obtained from various experts. Timothy's experts, Kathy Schwaninger, consultant to United Cerebral Palsy, and Rose Bradder, Program Coordinator at the Child Development Center, testified that Timothy would benefit from a special educational program including physical and occupational therapy, with emphasis on functional skills. The school district presented Carrie Foss, Executive Director of the Child Development Center, who disagreed with her own staff and testified that Timothy had shown no progress. The district court relied heavily on another school district witness, Dr. Patricia Andrews, a developmental pediatrician, who testified that Timothy probably does not have the capacity to learn educational skills and activities. She also testified: that she was not an expert in the education of handicapped children; that her only contact with Timothy was when he was two months old; that he might have the capacity to respond to his environment and change in some ways; that the X-ray bubble test performed on Timothy in 1976, which she was using as a basis for concluding that Timothy had virtually no brain cortex and therefore no capacity to learn, was not the most sophisticated and accurate technology currently available; and that even a CAT scan could not predict Timothy's ability to learn.

On July 15, 1988, the district court rendered its opinion entitled "Order on Motion for Judgment on the Pleadings or in the Alternative, Summary Judgment." The record shows that the court had before it all the materials and reports submitted in the course of the administrative hearings, and the testimony from the two-day hearing. The court made rulings of law and findings of fact. It first ruled that "under EAHCA [the Education for All Handicapped Children Act], an initial determination as to the child's ability to benefit from special education, must be made in order for a handicapped child to qualify for education under the Act." After noting that the New Hampshire statute (RSA 186–C) was intended to implement the EAHCA, the court held: "Under New Hampshire law, an initial decision must be made concerning the ability of a handicapped child to benefit from special education before an entitlement to the education can exist." The court then reviewed the materials, reports and testimony and found that "Timothy W. is not capable of benefitting from special education.... As a result, the defendant [school district] is not obligated to provide special education under either EAHCA [the federal statute] or RSA 186–C [the New Hampshire statute]." Timothy W. has appealed this order. Neither party objected to the procedure followed by the court.

The primary issue is whether the district court erred in its rulings of law. Since we find that it did, we do not review its findings of fact.

## II. THE LANGUAGE OF THE ACT

### A. The Plain Meaning of the Act Mandates a Public Education for All Handicapped Children

The Education for All Handicapped Children Act, [hereinafter the Act], 20 U.S. C. §§ 1400 et seq., was enacted in 1975 to ensure that handicapped children receive an education which is appropriate to their unique needs. In assessing the plain meaning of the Act, we first look to its title: The Education for *All* Handicapped Children Act. (Emphasis added). The Congressional Findings section of the Act states that there were eight million handicapped children, that more than half of them did not receive appropriate educational services, and that one million were excluded entirely from the public school system. 20 U.S.C. § 1400(b)(1), (3), and (4). Given these grim statistics, Congress concluded that "State and local educational agencies have a responsibility to provide education for *all*

handicapped children...." 20 U.S.C. § 1400(b)(8) (emphasis added). In directly addressing the educability of handicapped children, Congress found that "developments in the training of teachers and in diagnostic and instructional procedures and methods have advanced to the point that, given appropriate funding, State and local educational agencies *can and will* provide effective special education and related services to meet the needs of handicapped children." 20 U.S.C. § 1400(b)(7) (emphasis added). The Act's stated purpose was "to assure that *all* handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, ... [and] to assist states and localities to provide for the education of *all* handicapped children ..." 20 U.S.C. § 1400(c) (emphasis added).

The Act's mandatory provisions require that for a state to qualify for financial assistance, it must have "in effect a policy that assures *all* handicapped children the right to a free appropriate education." 20 U.S.C. § 1412(1) (emphasis added). The state must "set forth in detail the policies and procedures which the State will undertake ... to assure that—there is established a goal of providing full educational opportunity to *all* handicapped children ..., [and that] a free appropriate public education will be available for *all* handicapped children between the ages of three and eighteen ... not later than September 1, 1978, and for *all* handicapped children between the ages of three and twenty-one ... not later than September 1, 1980...." 20 U.S.C. § 1412(2)(A) and (B) (emphasis added). The state must also assure that "*all* children residing in the State who are handicapped, *regardless of the severity of their handicap*, and who are in need of special education and related services are identified, located, and evaluated...." 20 U.S.C. § 1412(2)(C) (emphasis added). *See also* 20 U.S.C. § 1414(a)(1)(A). The Act further requires a state to:

> establish[ ] *priorities* for providing a free appropriate public education to *all* handicapped children, ... first with respect to handicapped children who are not receiving an education, and second *with respect to handicapped children, within each disability, with the most severe handicaps* who are receiving an inadequate education....

20 U.S.C. § 1412(3) (emphasis added). *See also* 20 U.S.C. § 1414(a)(1)(C). Thus, not only are severely handicapped children not excluded from the Act, but the most severely handicapped are actually given *priority* under the Act.

In addition, the duties of the Secretary are listed as including the evaluation of "the effectiveness of State efforts to assure the free appropriate public education of *all* handicapped children" and transmitting "a report on the progress being made toward the provision of free appropriate public education to *all* handicapped children." 20 U.S.C. § 1418(a) and (c) (emphasis added). In its discussion of reallocation of funds, the Act states that "whenever a State educational agency determines that a local educational agency is adequately providing a free appropriate public education to *all* handicapped children ... [it] may reallocate funds...." 20 U.S.C. § 1414(e) (emphasis added).

■ The language of the Act could not be more unequivocal. The statute is permeated with the words "*all* handicapped children" whenever it refers to the target population. It never speaks of any exceptions for severely handicapped children. Indeed, as indicated *supra*, the Act gives priority to the most severely handicapped. Nor is there any language whatsoever which requires as a prerequisite to being covered by the Act, that a handicapped child must demonstrate that he or she will "benefit" from the educational program. Rather, the Act speaks of the *state's* responsibility to design a special education and related services program that will meet the unique "needs" of all handicapped children. The language of the Act in its entirety makes clear that a "zero-reject" policy is at the core of the Act, and that no child, regardless of the severity of his or her handicap, is to ever again be subjected to the deplorable state of affairs which existed at the time of the Act's passage, in

which millions of handicapped children received inadequate education or none at all. In summary, the Act mandates an appropriate public education for all handicapped children, regardless of the level of achievement that such children might attain.

## B. Timothy W.: A Handicapped Child Entitled to An Appropriate Education

Given that the Act's language mandates that all handicapped children are entitled to a free appropriate education, we must next inquire if Timothy W. is a handicapped child, and if he is, what constitutes an appropriate education to meet his unique needs.

### (1) *handicapped children:*

The implementing regulations define handicapped children as "being mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, other health impaired, deaf-blind, multi-handicapped, or as having specific learning disabilities, who because of those impairments need special education and related services." 34 C.F.R. § 300.5. *See also* 20 U.S.C. § 1401(1). "Mentally retarded" is described as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period, which adversely affects a child's educational performance." 34 C.F.R. § 300.5(b)(4).[3] "Multi-handicapped" is defined as "concomitant impairments (such as mentally retarded—blind, mentally retarded—orthopedically impaired, etc.), the combination of which causes such severe educational problems that they cannot be accommodated in special education programs solely for one of the impairments." 34 C.F.R. § 300.5(b)(5). "Orthopedically impaired" means "a severe orthopedic impairment which adversely affects a child's educational performance" and "includes im-

pairments caused by congenital anomaly, ... disease, ... [and] from other causes (e.g. cerebral palsy, ... )." 34 C.F.R. § 300.5(b)(6). "Specific learning disability" includes such conditions as "perceptual handicaps, brain injury, minimal brain disfunction." 34 C.F.R. § 300.5(b)(9).

■ There is no question that Timothy W. fits within the Act's definition of a handicapped child: he is multiply handicapped and profoundly mentally retarded. He has been described as suffering from severe spasticity, cerebral palsy, brain damage, joint contractures, cortical blindness, is not ambulatory, and is quadriplegic.

### (2) *appropriate public education:*

The Act and the implementing regulations define a "free appropriate public education" to mean "special education and related services which are provided at public expense ... [and] are provided in conformity with an individualized education program." 34 C.F.R. § 300.4; 20 U.S.C. § 1401(a)(18).

■ (a) *"Special education"* means "specially designed instruction, at no cost to the parent, to meet the unique needs of a handicapped child, including classroom instruction, instruction in *physical education,* home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.14(a)(1); 20 U.S.C. § 1401(a)(16) (emphasis added). It is of significance that the Act explicitly provides for education of children who are so severely handicapped as to require hospitalization or institutionalization. Timothy W.'s handicaps do not require such extreme measures, as he can be educated at home. The Act goes on to define "physical education" as the "development of: physical and motor fitness; fundamental motor skills and patterns ... [and] includes special physical education, adapted physical education, movement edu-

---

**3.** It is noteworthy that the regulations make no distinctions among the four recognized degrees of mental retardation: mild, moderate, severe, and profound. *See* American Psychiatric Association, *Diagnostic and Statistic Manual of Mental Disorders* 39–40 (3d ed. rev. 1987) (children with profound mental retardation, having IQ's below 20 and displaying minimal capacity for sensorimotor functioning, may improve their motor development, self-care, and communication skills if appropriate training is provided).

cation, and motor development." 34 C.F.R. § 300.14(b)(2). Thus, the Act's concept of special education is broad, encompassing not only traditional cognitive skills, but basic functional skills as well.

(b) *"Related services"* means "transportation and such developmental, corrective, and other supportive services as are required to assist a handicapped child to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation...." 34 C.F.R. § 300.13(a); 20 U.S.C. § 1401(a)(17). "Physical therapy" means "services provided by a qualified physical therapist." 34 C.F.R. § 300.13(7). "Occupational therapy" includes "improving, developing or restoring functions impaired or lost through illness, injury, or deprivation; improving ability to perform tasks for independent functioning...." 34 C.F.R. § 300.13(5). Furthermore, the "comment" to these implementing regulations notes that "the list of related services is not exhaustive and may include other developmental, corrective, or supportive services ... if they are required to assist a handicapped child to benefit from special education."

(c) An *"individualized education program"* is a written plan developed by the local educational agency in conjunction with the parents and teacher, which provides "specially designed instruction to meet the unique needs" of the handicapped child. 20 U.S.C. § 1401(a)(19). Such a program is to be periodically reviewed, and if appropriate, revised. 20 U.S.C. § 1412(4) and 1414(a)(5).

The record shows that Timothy W. is a severely handicapped and profoundly retarded child in need of special education and related services. Much of the expert testimony was to the effect that he is aware of his surrounding environment, makes or attempts to make purposeful movements, responds to tactile stimulation, responds to his mother's voice and touch, recognizes familiar voices, responds to noises, and parts his lips when spoon fed. The record contains testimony that Timothy W.'s needs include sensory stimulation, physical therapy, improved head control, socialization, consistency in responding to sound sources, and partial participation in eating. The educational consultants who drafted Timothy's individualized education program recommended that Timothy's special education program should include goals and objectives in the areas of motor control, communication, socialization, daily living skills, and recreation. The special education and related services that have been recommended to meet Timothy W.'s needs fit well within the statutory and regulatory definitions of the Act.

■ We conclude that the Act's language dictates the holding that Timothy W. is a handicapped child who is in need of special education and related services because of his handicaps. He must, therefore, according to the Act, be provided with such an educational program. There is nothing in the Act's language which even remotely supports the district court's conclusion that "under [the Act], an initial determination as to a child's ability to benefit from special education, must be made in order for a handicapped child to qualify for education under the Act." The language of the Act is directly to the contrary: a school district has a duty to provide an educational program for every handicapped child in the district, regardless of the severity of the handicap.

### III. LEGISLATIVE HISTORY

An examination of the legislative history reveals that Congress intended the Act to provide a public education for all handicapped children, without exception; that the most severely handicapped were in fact to be given priority attention; and that an educational benefit was neither guaranteed nor required as a prerequisite for a child to receive such education. These factors were central, and were repeated over and over again, in the more than three years of congressional hearings and debates, which culminated in passage of the 1975 Act.

### A. Education For All Handicapped Children

The Act was a response to tomes of testimony and evidence that handicapped

children were being systematically excluded from education outright, or were receiving grossly inadequate education. The Office of Education provided Congress with a report documenting that there were eight million handicapped children, and that more than four million of them were not receiving an appropriate education, including almost two million who were receiving *no* education at all. *See* S.Rep. No. 168, 94th Cong., 1st Sess. 8 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News, 1425, 1432 [hereinafter Senate Report]; H.R.Rep. No. 332, 94th Cong., 1st Sess. 11 (1975) [hereinafter House Report]; codified at 20 U.S.C. § 1400(b)(1)–(4). There were innumerable individuals, including parents, teachers, and other professionals, who gave testimony at the congressional hearings confirming the exclusion of handicapped children from educational services. *See, e.g., Education for all Handicapped Children, 1973–74: Hearings on S6 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare,* 93d Cong., 1st Sess. (1973–74) [hereinafter Senate Hearings].

The record is replete with statements by legislators that the Act was in response to this deplorable state of affairs:

> *Exclusion from school,* institutionalization, the lack of appropriate services to provide attention to the individual child's need—indeed, the *denial of equal rights* by a society which proclaims liberty and justice for all of its people—are echoes which the subcommittee has found throughout all of its hearings....

Senate Hearings at 1155–56 (emphasis added) (remarks of Sen. Williams, Committee Chairman, principal author of bill).

> For many years handicapped children have been placed in institutions, or segregated in schools and classes, or *left to sit at home,* where they have not received the educational opportunity which is their right under the law.

Senate Hearings at 1153 (emphasis added) (remarks of Sen. Mondale, Subcommittee member).

> What we are after in this legislation is to rewrite one of the saddest chapters in American education, a chapter in which we were silent while young children were shut away and condemned to a life without hope. This legislation offers them hope, hope that *whatever their handicap,* they will be given the chance to develop their abilities as individuals and to reach out with their peers for their own personal goals and dreams.

Senate Hearings at 341 (emphasis added) (remarks of Sen. Kennedy, co-sponsor of bill).

Moreover, the legislative history is unambiguous that the primary purpose of the Act was to remedy the then current state of affairs, and provide a public education for *all* handicapped children. As the Committee Chairman, Senator Williams stated:

> We must recognize our responsibility to provide education for *all* children which meets their unique needs. The denial of the right to education and to equal opportunity within this Nation for handicapped children—whether it be outright exclusion from school, the failure to provide an education which *meets the needs of a single handicapped child,* or the refusal to recognize the handicapped child's right to grow—is a travesty of justice and a denial of equal protection of the law.

120 Cong.Rec. S15271 (1974).

> Most states have legal provisions which authorize school authorities to exclude certain [handicapped] children from public school.... [This] act establishes a target date of 1976 for bringing *all* of the Nation's handicapped children into adequate programs.

Senate Hearings at 342 (emphasis added) (remarks of Sen. Brooke, co-sponsor of bill).

> Recent court decisions ... have made it clearer than ever that we have not only a moral but also a legal obligation to provide the opportunity for *every handicapped citizen* to insure his or her highest educational potential. An important provision of the bill before us today would require that every State have in effect a policy stating the *right of all handicapped children* to a "free appropriate public education".... The bill

would also require that each handicapped child be treated as an individual with unique strengths and weaknesses, and not as a member of a category of children all presumed to have the same needs.

Senate Hearings at 1153–54 (emphasis added) (remarks of Sen. Mondale, Subcommittee member).[4] The Senate Committee recognized "the need for a final date in legislation by which time *all* handicapped children are to be provided a free appropriate public education," and that "the failure to provide a right to education to handicapped children cannot be allowed to continue." Senate Report at 7, 9 (1975), 1975 U.S.Code Cong. & Admin.News, 1431, 1433. Senator Williams, the principal author of the statute, described the Conference Report:

This measure fulfills the promise of the Constitution that there shall be equality of education for all people and that handicapped children no longer will be left out.... The conference report establishes as a matter of law ... provisions which will assure the right to education for *all* handicapped children in the United States. It establishes a process by which the goal of educating *all* handicapped can and will be established.... [I]t require[s] an individualized education

program tailored to the unique needs of *each* handicapped child.... [It] protects against handicapped children being excluded from school by requiring that *all* such children aged 3 to 18 be served.... [It] establishes the State educational agency as solely responsible for the provision of free appropriate education to *all* handicapped children in the State.... [T]he timetable and priorities assure that the goals of this act will be met *for each and every handicapped child* within a State.

121 Cong.Rec. S37413–14 (1975) (emphasis added).[5]

## B. Priority For The Most Severely Handicapped

Not only did Congress intend that all handicapped children be educated, it expressly indicated its intent that the most severely handicapped be given priority. This resolve was reiterated over and over again in the floor debates and congressional reports, as well as in the final legislation.

The principal author, Senator Williams, stated that the bill "assures that handicapped children in the greatest need will be given *priority* by requiring that services be provided first to those children not re-

---

4. *See also, e.g.,* statements during the floor debate on the House Bill: Rep. Cornell (co-sponsor of bill): "the purpose of this bill is ... to assure that *all* handicapped children have available to them special educational and related services designed to meet their unique needs ... [and] to assist States and localities to provide for the education of *all* handicapped children," 121 Cong.Rec. H25538 (1975); Rep. Quie (ranking minority member of subcommittee): "we provide in this legislation that if you [the States] are going to receive funds by 1978 you have to provide education for *all* of those who are handicapped within the State," *id.* at H25535. (Emphasis added).

5. Other floor statements from co-sponsors and conference committee members reiterated the same point. For example, Sen. Schweiker commented: "The purpose of the pending measure is to ensure that *all* handicapped children have available to them a free appropriate public education," 121 Cong.Rec. S37417 (1975); Sen. Biden: "there must be an assurance of an effective policy which guarantees the right of *all* handicapped children to a free, appropriate public education," *id.* at S37418; Sen. Cranston: "to

assure equal educational opportunities for *all* children of this country, *regardless of their physical or mental abilities,*" *id.* at S37418; Sen. Beall: "establishing education as a right for *all* children *regardless of any handicap* they may experience," *id.* at S37419; Rep. Brademas: "this measure is necessary ... if we are to insure that *all* children in the United States receive the free education to which they are entitled," 121 Cong.Rec. H37024 (1975); Rep. Perkins: "the congressional goal of insuring a full educational opportunity for *all* handicapped children," *id.* at H37025; Rep. Gude: "*all* children *regardless of any exceptional conditions* have a constitutional right to publicly supported education," *id.* at H37027; Rep. Ford: "school systems ... must agree to provide a free, public education to *all* handicapped children," *id.* at H37028; Rep. Conte: "this legislation ... will prove to be the long awaited step towards a national program to 'insure' quality education to *all* handicapped Americans who number in the millions .. and puts education for the handicapped in its proper perspective—an 'essential' supplementary program *due each and every handicapped* American," *id.* at H37029. (Emphasis added).

ceiving an education; and second, *to those children with the most severe handicaps* receiving an inadequate education." 121 Cong.Rec. S37413 (1975) (emphasis added).[6]

The Senate Committee's report stated: [T]he Committee has provided that States shall provide second priority ... to handicapped children with the most severe handicaps.... It is the intent of the Committee that States follow this priority by providing services to handicapped children who, within each disability group, (including the multi-handicapped as a disability group) have the most severe handicaps. *Priority must be given to multi-handicapped children who are the most severely disabled....* Senate Report at 22 (1975), 1975 U.S.Code Cong. & Admin.News, 1446. *See also id.* at 18, 46. The House report also included such priorities: "In conformance with the overall goal of ending exclusion ... [the bill gives] first priority to children 'unserved' [and] second priority to severely handicapped children." House Report at 12 (1975).

This priority reflected congressional acceptance of the thesis that early educational intervention was very important for severely handicapped children. *See, e.g.,* 121 Cong.Rec. S19493 (1975) (remarks of Sen. Williams) ("The Bureau of Education for the handicapped has documented that, especially with respect to children who are most severely handicapped—that is, persons who are deaf, blind, deaf-blind, severely or profoundly mentally retarded, severely physically handicapped—the earlier educational services are provided the greater the results.").

If the order of the district court denying Timothy W. the benefits of the Act were to be implemented, he would be classified by the Act as in even greater need for receiving educational services than a severely multi-handicapped child receiving inadequate education. He would be in the *highest priority*—as a child who was not receiving any education at all.

## C. Guarantees of Educational Benefit Are Not A Requirement For Child Eligibility

In mandating a public education for all handicapped children, Congress explicitly faced the issue of the possibility of the non-educability of the most severely handicapped. The Senate Report stated, "The Committee recognizes that in many instances the process of providing special education and related services to handicapped children is *not guaranteed to produce any particular outcome.*" Senate Report at 11 (1975), 1975 U.S.Code Cong. & Admin. News, 1435, (emphasis added). The report continued: "The Committee has deleted the language of the bill as introduced which required objective criteria and evaluation procedures by which to assure that the short term instructional goals were met." *Id.* at 12, 1975 U.S.Code Cong. & Admin. News, 1436. *See also Hendrick Hudson Bd. of Education v. Rowley,* 458 U.S. 176, 192, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982) (quoting the Senate Report as support for its conclusion that the Act ensures handicapped children access to a public education, but does not guarantee any particular level of achievement from that education).

Thus, the district court's major holding, that proof of an educational benefit is a prerequisite before a handicapped child is entitled to a public education, is specifically belied, not only by the statutory language, but by the legislative history as well. We have not found in the Act's voluminous legislative history, nor has the school district directed our attention to, a single af-

---

**6.** *See also, e.g.,* remarks of Sen. Javits (conference committee member): "[the bill] sets forth a priority for the use of Federal funds for the education of handicapped children ... the first priority is to children 'unserved,' ... the second priority to children inadequately served with a priority on the most severely handicapped children," 121 Cong.Rec. S37417 (1975); Sen. Biden (co-sponsor of bill): "[the bill] gives first priori-ty to 'unserved' handicapped children and then to children who have been inadequately served even though they are severely handicapped," *id.* at 37418; Rep. Brademas: "the moneys received ... must be spent first on providing a public education for handicapped children not now being served, and second, on more adequately serving those children who are severely handicapped," 121 Cong.Rec. H37027 (1975).

firmative averment to support a benefit/eligibility requirement. But there is explicit evidence of a contrary congressional intent, that *no* guarantee of any particular educational outcome is required for a child to be eligible for public education.

We sum up. In the more than three years of legislative history leading to passage of the 1975 Act, covering House and Senate floor debates, hearings, and Congressional reports, the Congressional intention is unequivocal: Public education is to be provided to all handicapped children, unconditionally and without exception. It encompasses a universal right, and is not predicated upon any type of guarantees that the child will benefit from the special education and services before he or she is considered eligible to receive such education. Congress explicitly recognized the particular plight and special needs of the severely handicapped, and rather than excluding them from the Act's coverage, gave them priority status. The district court's holding is directly contradicted by the Act's legislative history, as well as the statutory language.

### D. Subsequent Amendments to the Act

In the 14 years since passage of the Act, it has been amended four times.[7] Congress thus has had ample opportunity to clarify any language originally used, or to make any modifications that it chose. Congress has not only repeatedly reaffirmed the original intent of the Act, to educate all handicapped children regardless of the severity of their handicap, and to give priority attention to the most severely handicapped, it has in fact *expanded* the provisions covering the most severely handicapped children. Most significantly, Congress has never intimated that a benefit/eligibility requirement was to be instituted.

*1977:*

In 1977, an amendment was proposed to extend the discretionary programs of the 1975 Act, dealing with research for educating the handicapped. Congress reiterated that the goal of the bill was "to assist states to provide each handicapped child with his rightful opportunity to an education." *Report of Mr. Perkins to Accompany H.R. 6692*, 95th Cong., 1st Sess. 5 (1977). The report stressed the need for continual research to improve and develop the methodologies for teaching handicapped children:

> The purpose of this provision is to improve the educational opportunities for handicapped children through support of applied research and related activities. The activities conducted under the research program provide information on resources essential to the development of full *educational opportunities for every handicapped child.*

*Id.* at 10 (emphasis added). The particular problems of educating the severely handicapped were acknowledged and addressed: "The objectives of this program include the demonstration of effective educational and training programs, the long term benefits of providing services to severely handicapped children, and building the capacity of state and local governments to provide quality specialized services through replication and adaptation of demonstrated practices." *Education of Handicapped Amendments of 1977, Report to Accompany S. 725*, S.Rep. No. 124, 95th Cong., 1st Sess. 4 (1977). Congress clearly understood that educational techniques and approaches for the severely handicapped were in a continual state of growth and readjustment, and that capitalizing on these refinements was integral for accomplishing the Act's mandate:

> The activities conducted under the research program provide the information and resources essential to the development of full educational opportunities for every handicapped child.... *The research activities contribute significantly to the total mission of educating all handicapped children.*

*Id.* at 9 (emphasis added).

Thus, we see that in this amendment, Congress reiterated the thesis present in the original Act, that it is the state's re-

---

7. Pub.L. 95–561, 92 Stat. 2364 (1978); Pub.L. 98–199, 97 Stat. 1357 (1983); Pub.L. 99–372, 100 Stat. 796 (1986); and Pub.L. 99–457, 100 Stat. 1145 (1986).

sponsibility to experiment, refine, and improve upon the educational services it provides to handicapped children, and not, as the school district would have it, to exclude handicapped children if there is no proof that they can benefit from the existing program that a state might offer at a particular time. Congress clearly saw education for the handicapped as a dynamic process, in which new methodologies would be continually perfected, tried, and either adopted or discarded, so that the state's educational response to each handicapped child's particular needs could be better met.

*1983:*

In the hearings for the 1983 amendments, Congress likewise reaffirmed the original intent of the 1975 Act:

> With the passage of [the Act], Congress granted to *all* handicapped children *the "right" to a free appropriate public education.* Prior to the development of this legislation ... some [handicapped children] were receiving no educational services at all. [The Act] is the vehicle through which the federal government maintains a partnership with the states and localities to end the educational neglect of handicapped children.

*Oversight Hearings on Proposed Changes in Regulations for the Education for All Handicapped Children Act: Hearings Before the Subcomm. on Select Education of the Comm. on Education and Labor, House of Representatives,* 97th Cong., 2d Sess. 8 (1982).

The bill amended the term "special education" to clarify that services provided should be designed "to meet the unique 'educational' needs of the handicapped child," and stated that "it is the intent of the Committee that the term 'unique educational needs' be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical, and vocational needs." H.R.Rep. No. 410, 98th Cong., 1st Sess. 19 (1983), *reprinted in* 1983 U.S.Code Cong. & Admin.News 2088, 2106.

The 1983 amendments, which extended and strengthened programs authorized under the 1975 Act, directly addressed the education of severely handicapped children. The bill reaffirmed section 624 (dealing with research, innovation, training, and dissemination activities in connection with centers and services for the handicapped) as "a key component" of the Act, and stated: "[I]n recognition of the role of section 624 as *the principal vehicle since 1978 for funding projects which serve handicapped children with the most severe disabilities (such as the multiple handicapped), the Committee bill reinforces this focus* by establishing a specific authorization of appropriation for [this subsection]." *Id.* at 28, 1983 U.S.Code Cong. & Admin.News, 2115 (emphasis added). The bill also specifically expanded services for deaf blind children. *Id.* at 25–26. As the Senate Committee's report on the amendments stated:

> This program is designed to assist state and local educational agencies in *improving education and training to severely handicapped children* and youth, many of whom require complex, varied and often times expensive educational services. In general, this group of children includes those who are classified as seriously emotionally disturbed, autistic, *profoundly and severely mentally retarded, and those with multiple handicapping conditions.* Since 1978, projects have been targeted to specific areas of national need concerning the education of the severely handicapped individuals.

*Education of the Handicapped Act Amendments of 1983: Report of Mr. Hatch to Accompany S. 1341, Comm. on Labor and Human Resources,* S.Rep. No. 191, 98th Cong., 1st Sess. 7 (1983).

So once again, Congress reaffirmed its commitment to provide a public education for children like Timothy W.

*1986:*

In the most recent amendments, Congress again reconfirmed its commitment to the original Act, and also provided for an extension of the age groups covered, mandating that all preschool handicapped children aged three to five be entitled to public education, and establishing a new federal

education program for handicapped babies from birth through age two. The Senate Committee report stated that "the Committee has provided the impetus for universal access to services for *all handicapped children beginning at birth."* S.Rep. No. 315, 99th Cong., 2d Sess. 3, 5 (1986). *See also* H.Rep. No. 860, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 2401. Sen. Stafford, co-sponsor of the amendments, commented:

> We are doing it because we have always known that all Americans have the right to equal educational opportunities. Indeed, over the years court decisions have directed our attention to the fact that all handicapped individuals ... [h]ave the right to public education, regardless of the degree of disability.... *[E]ven the most severely handicapped child can be made less dependent through education.*

132 Cong.Rec. S7038 (1986) (emphasis added).

These amendments focused particularly on the needs of deaf-blind and multiply handicapped children, extending provisions for specialized, intensive professional and allied services, methods and aids that are found to be most effective. 20 U.S.C. § 1422. The Senate Report stated: "[T]he majority of the deaf-blind population is severely and multiply handicapped.... By retaining current law the Committee recognizes the continued need for the resources ... serving deaf-blind children.... [T]hese resources should be made available to certain severely, multiply handicapped children." S.Rep. No. 315, 99th Cong., 2d Sess. 12–13 (1986). Thus, the commitment to educate the most severely handicapped was again reconfirmed. As Rep. Miller concluded in a comment directly pertinent to the actions of the school district in this case:

> What we have seen over the 10 years of this program is that this law has dramatically increased the opportunities for the handicapped to participate.... Time and again we were told of cases where people tried to deny that access to go back to the days that gave them impetus to this legislation when children who were hand-

icapped were educated in basements, ... children were denied education.... This legislation has overcome that problem.... But that is not to say that all educational institutions have accepted it readily and that they still do not battle and seek the time when perhaps they can roll this back. So the extension of this program is an important signal....

132 Cong.Rec. H7905 (September 22, 1986).

In summary, the Congressional reaffirmation of its intent to educate all handicapped children could not be any clearer. It was unequivocal at the time of passage of the Act in 1975, and it has been equally unequivocal during the intervening years. The school district's attempt in the instant case to "roll back" the entire thrust of this legislation completely ignores the overwhelming congressional consensus on this issue.

## IV. CASE LAW

### A. Cases Relied on in the Act

In its deliberations over the Act, Congress relied heavily on two landmark cases, *Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania* (PARC), 343 F.Supp. 279 (E.D.Pa.1972) and *Mills v. Board of Education of the District of Columbia,* 348 F.Supp. 866 (D.D.C.1972), which established the principle that exclusion from public education of any handicapped child is unconstitutional. *See* Senate Report at 6–7 (1975), 1975 U.S. Code Cong. & Admin.News, 1430, 1431 ("[The Act] followed a series of landmark court cases establishing in law the right to education for all handicapped children.... Since those initial decisions in 1971 and 1972 and with similar decisions in 27 states, it is clear today that this 'right to education' is no longer in question."); *see also* House Report at 3–4 (1975).

The court in *PARC* articulated the thesis that:

> *[A]ll mentally retarded persons are capable of benefitting from a program of education and training;* that the greatest number of retarded persons, given such education and training, are capable

of achieving self-sufficiency and the remaining few, with such education and training are capable of achieving some degree of self care....

*PARC*, 343 F.Supp. at 296 (emphasis added). The Consent Agreement for the case, approved by the court, concluded that "Pennsylvania may not deny *any mentally retarded child* access to a free public program of education and training." *Id.* at 307 (emphasis added). In *Mills*, the court held that denying handicapped children a public education was violative of the constitutional guarantees of equal protection and due process. *Mills*, 348 F.Supp. at 875. It ordered that the District of Columbia "shall provide to each child of school age a free and suitable publicly-supported education *regardless of the degree of the child's mental, physical or emotional disability or impairment." Id.* at 878 (emphasis added).

## B. All Handicapped Children are Entitled to a Public Education

Subsequent to the enactment of the Act, the courts have continued to embrace the principle that all handicapped children are entitled to a public education, and have consistently interpreted the Act as embodying this principle. In *Kruelle v. New Castle County School District*, 642 F.2d 687 (3d Cir.1981), the court declared that "[t]he Education Act embodies a strong federal policy to provide an appropriate education for every handicapped child," *id.* at 690, that there was an "unequivocal congressional directive to provide an appropriate education for all children regardless of the severity of the handicap, 20 U.S.C. § 1412(2)(C)," *id.* at 695, and that *"[t]he language and the legislative history of the Act simply do not entertain the possibility that some children may be untrainable." Id.* at 695 (emphasis added). In *Gladys J. v. Pearland Independent School District*, 520 F.Supp. 869, 879 (S.D.Tex. 1981), it was held that the school district must provide a residential educational placement for a severely retarded, multiply handicapped, schizophrenic child who had "extremely guarded" prospects, because "[t]he language and legislative history of

[the] Act simply do not admit of the possibility that some children may be beyond the reach of our educational expertise." In *Garrity v. Gallen*, 522 F.Supp. 171, 215 (D.N.H.1981), *aff'd*, 697 F.2d 452 (1st Cir. 1983), a class action suit brought by residents of the Laconia State School against the state, to ensure that profoundly retarded and multiply physically handicapped students receive educational services under the Act, the district court stated: "plaintiffs succeeded in proving at trial not only that certain categories of individuals such as the profoundly retarded have, as a group, been discriminated against in the past, but that certain assumptions about their inability to learn and develop are inaccurate.... [And] although at one time [they] were cast aside as 'untrainable,' [many] have through habilitation learned to care for themselves...." The court concluded that "profoundly retarded residents must be afforded education and training services to the same extent as mildly retarded residents, even though the teaching methods might be different." *Id.* at 217. In its Order for Implementation, the court stated *"No member of the aforesaid subclass shall be denied special education and related services based on the severity of his/her handicap...."* (emphasis added). And in *Battle v. Commonwealth of Pennsylvania*, 629 F.2d 269 (3d Cir.1980), *cert. denied*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), rather than the court ruling that a severely and profoundly handicapped child's seemingly insurmountable handicaps should preclude him from a public education, the court ordered the school to provide him an additional summer program *because* of the severity of his disability.

The district court's reliance on *Matthews v. Campbell*, 3 EHLR 551:264 (E.D.Va. 1979), is misfounded. In ordering the school district to provide a residential placement for a profoundly mentally retarded child, the *Matthews'* court speculated as to what it might do if the child proved uneducable even in that setting, but commented that "[n]either the language of the Act nor the legislative history appears to contemplate the possibility that certain chil-

dren may simply be untrainable." *Id.* at 266. The district court's reliance on *Parks v. Pavkovic,* 753 F.2d 1397 (7th Cir.1985), is also misplaced. In *Parks,* the court *speculated* that in the *hypothetical* case of a child in a *coma,* the state might not have to pay for the living expenses of such a child placed in an institution since such a child would be uneducable and therefore his living expenses would not be related to education. *Id.* at 1405. This dictum is irrelevant to the instant case. Timothy W. lives at home, is seeking only educational services, not institutional placement, is not in a coma, and does respond to stimuli and his environment. Moreover, the *actual* issue in the *Parks* case directly dealt with the question of uneducability for severely handicapped and retarded children (as opposed to a hypothetical child in a coma):

> With persons as severely retarded as [plaintiff], the scope for education is extremely limited, but we do not understand the state to be arguing that [plaintiff] or the other members of the class are uneducable. *Nor would such an argument be likely to succeed (see, e.g., Abrahamson v. Hershman,* 701 F.2d [223] at 228).

*Id.* at 1406 (emphasis added).

C. Education is Broadly Defined

The courts have also made it clear that education for the severely handicapped under the Act is to be broadly defined. In *Battle,* 629 F.2d at 275, the court stated that under the Act, the concept of education is necessarily broad with respect to severely and profoundly handicapped children, and "[w]here basic self help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point." *See also Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 176, 183 (3d Cir.1988) ("the physical therapy itself may form the core of a severely disabled child's special education," and the fact that such a child "may never achieve the goals set in a traditional classroom does not undermine the fact that his brand of education (training in basic life skills) is an essential part of [the Act's] mandate.");

*DeLeon v. Susquehanna Community School District,* 747 F.2d 149, 153 (3d Cir. 1984) ("[t]he educational program of a handicapped child, particularly a severely and profoundly handicapped child ... is very different from that of a non-handicapped child" and "[t]he program may consist largely of 'related services' such as physical, occupational, or speech therapy"); *Abrahamson v. Hershman,* 701 F.2d 223, 228 (1st Cir.1983) ("Congress established a priority under the Act for the most severely retarded children, 20 U.S.C. § 1412(3), for many of whom, certainly, education will not consist of classroom training but rather training in very basic skills"); *Kruelle,* 642 F.2d at 693 ("the concept of education is necessarily broad" with respect to severely or profoundly retarded children); *Campbell v. Talladega County Board of Education,* 518 F.Supp. 47, 50 (N.D.Ala.1981) (the educational programs of children with severe handicaps consist of teaching them "functional" skills); *North v. District of Columbia Board of Education,* 471 F.Supp. 136, 141 (D.D.C.1979) (in ruling that a school district must provide residential placement for the severely handicapped plaintiff, the court noted that the educational, social, emotional, and medical problems were so intimately intertwined, it could not separate them); *School District of the Menomonie Area v. Rachel W.,* 1983–1984 EHLR (Education for the Handicapped Law Report) DEC. 505:220, 227 (occupational and physical therapy are to be considered educational services because education for severely handicapped children must be viewed broadly to include related therapies).

In the instant case, the district court's conclusion that education must be measured by the acquirement of traditional "cognitive skills" has no basis whatsoever in the 14 years of case law since the passage of the Act. All other courts have consistently held that education under the Act encompasses a wide spectrum of training, and that for the severely handicapped it may include the most elemental of life skills.

## D. Proof of Benefit is Not Required

The district court relied heavily on *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), in concluding that as a matter of law a child is not entitled to a public education unless he or she can benefit from it. The district court, however, has misconstrued *Rowley*. In that case, the Supreme Court held that a deaf child, who was an above average student and was advancing from grade to grade in a regular public school classroom, and who was already receiving substantial specialized instruction and related services, was not entitled, in addition, to a full time sign-language interpreter, because she was already benefitting from the special education and services she was receiving. The Court held that the school district was not required to *maximize* her educational achievement. It stated, "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, ... the child is receiving a 'free appropriate public education' as defined by the Act," *id.* at 189, 102 S.Ct. at 3042, and that "certainly the language of the statute contains no requirement ... that States maximize the potential of handicapped children." *Id.* at 189, 102 S.Ct. at 3042.

*Rowley* focused on the *level* of services and the quality of programs that a *state* must provide, not the criteria for *access* to those programs. *Id.* at 207, 102 S.Ct. at 2051. The Court's use of "benefit" in *Rowley* was a substantive limitation placed on the state's choice of an educational program; it was not a license for the state to exclude certain handicapped children. In ruling that a state was not required to provide the maximum benefit possible, the Court was *not* saying that there must be proof that a child will benefit before the state is obligated to provide any education at all. Indeed, the Court in *Rowley* explicitly acknowledged Congress' intent to ensure public education to all handicapped children without regard to the level of achievement that they might attain.

Congress expressly 'recognize[d] that in many instances the process of providing special education and related services to handicapped children is *not guaranteed to produce any particular outcome.*' S.Rep., at 11 [1975 U.S.Code Cong. & Admin.News at 1435]. Thus, the *intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.*

*Id.* at 192, 102 S.Ct. at 3043 (emphasis added).

*Rowley* simply does not lend support to the district court's finding of a benefit/eligibility standard in the Act. As the Court explained, while the Act does not require a school to maximize a child's potential for learning, it does provide a "basic floor of opportunity" for the handicapped, consisting of "*access* to specialized instruction and related services." *Id.* at 201, 102 S.Ct. at 3048 (emphasis added). Nowhere does the Court imply that such a "floor" contains a trap door for the severely handicapped. Indeed, *Rowley* explicitly states: "[t]he Act requires special educational services for children 'regardless of the severity of their handicap,'" *id.* at 181 n. 5, 102 S.Ct. 3038 n. 5, and "[t]he Act requires participating States to educate a wide spectrum of handicapped children, from the marginally hearing-impaired to the profoundly retarded and palsied." *Id.* at 202, 102 S.Ct. at 3048–49. *See also Abrahamson*, 701 F.2d at 227 ("A school committee is required by the Act merely to ensure that the child be placed in a program that provides *opportunity* for some educational progress.") (emphasis added). This is a far cry from a requirement of proof that educational benefit *will definitely result*, before a child is entitled to receive that education.

Two administrative decisions subsequent to the *Rowley* case are also instructive. In *Contra Costa County Consortium*, 1985–1986 EHLR (Education for the Handicapped Law Report) DEC. 507:300, 301, the school district argued that a severely handicapped child with severe cognitive and motor delays (could not speak, voluntarily move his arms or legs, or communicate), was not eligible for special education ser-

vices because he could not benefit from such a program. The hearing officer held that the child was entitled to the education:

> [The *Rowley*] court said the intent of the [Act] was to provide *access to special education for handicapped children without regard to the level of achievement or success of the pupil.* The court in *Rowley* further said that the [Act] provided the "basic floor of opportunity" for availability to and access to special education and related services. The notion that the [Act] intended to open the door to special education and not to limit its availability is found at 20 U.S.C. § 1414(a)(1)(A). The Act is shown to require special education services for children "regardless of the severity of their handicap."

*Id.* at 507:302 (emphasis added). In *School District of the Menomonie Area v. Rachel W.*, 1983–1984 EHLR DEC. 505:220, 225, the hearing officer held that profoundly handicapped children "may not be excluded from special education programming solely by virtue of their inability to demonstrate to the satisfaction of the [school] district some undefined quantum of educational benefit resulting from their exposure to such programming." The opinion went on to state:

> [*Rowley*] does not support the position that *access* to special education programming under the EHA is conditioned on the handicapped child's ability to receive an educational benefit from the programming. What is envisioned by the EHA is that the educational programming and related services chosen by the schools will be reasonably calculated to be of some educational benefit to the child. What is not envisioned is that the appropriate educational programming and related services *will* result in an educational benefit being conferred. Special education can no more ensure good results than can regular education.

*Id.* at 225 (emphasis in original).

And most recently, the Supreme Court, in *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), has made it quite clear that it will not rewrite the language of the Act to include exceptions which are not there. The Court, relying on the plain language and legislative history of the Act, ruled that dangerous and disruptive disabled children were not excluded from the requirement of 20 U.S.C. § 1415(e)(3), that a child "shall remain in the then current educational placement" pending any proceedings, unless the parents consent to a change. The Court rejected the argument that Congress could not possibly have meant to allow dangerous children to remain in the classroom. The analogous holding by the district court in the instant case—that Congress could not possibly have meant to "legislate futility," i.e. to educate children who could not benefit from it—falls for the reasons stated in *Honig*. The Court concluded that the language and legislative history of the Act was unequivocal in its mandate to educate all handicapped children, with no exceptions. The statute "means what it says," and the Court was "not at liberty to engraft onto the statute an exception Congress chose not to create." *Id.* 108 S.Ct. at 605. As Justice Brennan stated: "We think it clear ... that Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students ... from school." *Id.* 108 S.Ct. at 604 (emphasis in original). Such a stricture applies with equal force to the case of Timothy W., where the school is attempting to employ its unilateral authority to exclude a disabled student that it deems "uneducable."

The district court in the instant case, is, as far as we know, the only court in the 14 years subsequent to passage of the Act, to hold that a handicapped child was not entitled to a public education under the Act because he could not benefit from the education. This holding is contrary to the language of the Act, its legislative history, and the case law.

## V.  CONCLUSION

The statutory language of the Act, its legislative history, and the case law construing it, mandate that all handicapped children, regardless of the severity of their

handicap, are entitled to a public education. The district court erred in requiring a benefit/eligibility test as a prerequisite to implicating the Act. School districts cannot avoid the provisions of the Act by returning to the practices that were widespread prior to the Act's passage, and which indeed were the impetus for the Act's passage, of unilaterally excluding certain handicapped children from a public education on the ground that they are uneducable.

 The law explicitly recognizes that education for the severely handicapped is to be broadly defined, to include not only traditional academic skills, but also basic functional life skills, and that educational methodologies in these areas are not static, but are constantly evolving and improving. It is the school district's responsibility to avail itself of these new approaches in providing an education program geared to each child's individual needs. The only question for the school district to determine, in conjunction with the child's parents, is what constitutes an appropriate individualized education program (IEP) for the handicapped child. We emphasize that the phrase "appropriate individualized education program" cannot be interpreted, as the school district has done, to mean "no educational program."

We agree with the district court that the Special Education Act of New Hampshire, N.H. Rev.Stat.Ann. 186–C, implements the federal statute. Its policy and purpose is as unequivocal as that of the federal Act:

> It is hereby declared to be the policy of the state that *all children* in New Hampshire be provided with equal educational opportunities. It is the purpose of this chapter to insure that the state board of education and the school districts of the state provide a free and appropriate public education for *all educationally handicapped children.*

N.H.Rev.Stat.Ann. 186–C:1 (emphasis added). For the reasons already stated, we hold that the New Hampshire statute is not subject to a benefit/eligibility test.

The judgment of the district court is reversed, judgment shall issue for Timothy W. The case is remanded to the district court which shall retain jurisdiction until a suitable individualized education program (IEP) for Timothy W. is effectuated by the school district. Timothy W. is entitled to an interim special educational placement until a final IEP is developed and agreed upon by the parties. The district court shall also determine the question of damages.

Costs are assessed against the school district.